IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA DENVER,

    Plaintiff,

v.

THE VERIZON CLAIMS REVIEW
COMMITTEE, *et al.*,

    Defendants.

Civil Action No.: RDB 09-902

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM ORDER**

Plaintiff Linda Denver ("Denver") filed this single-count Complaint under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001 *et seq.*, against Defendants the Verizon Claims Review Committee, the Verizon Pension Plan for Mid-Atlantic Associates, and Metropolitan Life Insurance Company (collectively, "Defendants"). Denver seeks judicial review of Defendants' unfavorable administrative decision to stop her disability pension payments. Pending before this Court are Defendants' and Denver's cross-motions for summary judgment, Denver's motion for leave to file supplemental memoranda and Defendants' motion to strike Denver's supplemental memoranda. The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons stated below, Defendants' Motion for Summary Judgment (Paper No. 38) is GRANTED, Denver's Motion for Summary Judgment (Paper No. 36) is DENIED, Denver's Motion for Leave to File Supplemental Memoranda (Paper No. 53) is DENIED and Defendants' Motion to Strike Plaintiff's Supplemental Memoranda (Paper No. 52) is MOOT.

1

## BACKGROUND

Bell Atlantic employed Denver as a service representative from June 8, 1970 until February 27, 1994, when Denver was found unable to work because she suffered from a number of health issues: a cerebral aneurysm, severe depression, chronic anxiety, rheumatoid arthritis, chronic pain and migraines. R. 001, 008, 124.[1] Denver was subsequently determined to be disabled pursuant to the Bell Atlantic Pension Plan ("the Plan") and began receiving Disability Pension payments, which she continued to accept for approximately the next eleven years. *Id.* After conducting a routine periodic evaluation of Denver's status as disabled under the Plan, however, a Plan representative sent Denver a letter on August 26, 2005 advising her that after reviewing her recent medical records Defendants no longer considered Denver to be disabled because she was able to work part-time and was in fact working part time. *Id.* 101-03. Denver seeks judicial review of Defendants' unfavorable administrative decision to stop these payments and contends that she remains disabled as defined by the Plan.

The Plan is a self-funded, ERISA-governed welfare plan that provides Disability Pension benefits to eligible participants.[2] *Id.* 008, 394, 514. The Plan defines a "disability" as a "medically determined condition of total and permanent disability." R. 377. Under the Plan, an initial determination that a participant is disabled and thus eligible for Disability Pension payments is not a permanent determination, and the payments "shall cease" when "the

---

[1] Defendants submitted the Administrative Record as Exhibit 1A to their Motion for Summary Judgment (Paper No. 38), which is cited by reference to Bates numbers.
[2] The Plan was renamed the "Verizon Plan for Mid-Atlantic Associates" (the "Verizon Plan") on January 1, 2001. R. 514. The Verizon Plan contains some provisions that are not found in the Bell Atlantic Pension Plan. R. 514. The Verizon Plan expressly provides, however, that these provisions apply only to employees who worked for Verizon Communications, Inc. on or after January 1, 1999. *Id.* Since Denver's employment with Bell Atlantic terminated in 1994, her benefits remain governed by the substantive terms of the Bell Atlantic Pension Plan.

participant ceases to suffer from Disability." *Id.* 398. Thus, the Plan requires a participant's disability to be confirmed by a qualified physician both prior to a disability determination and also "at reasonable intervals during" the payment of a Disability Pension. *Id.*

Defendant the Verizon Claims Review Committee ("VCRC") is the designated administrator for the Plan and, as such, is granted discretionary authority to interpret the Plan and determine whether a claimant is eligible for benefits. *Id.* 388. Defendant Metropolitan Life Insurance Company ("MetLife") assists the VCRC with reviewing claims and makes recommendations regarding participants' eligibility for benefits. *Id.* 030. Both the VCRC and MetLife conduct the periodic reviews of the Disability Pension payment recipients to determine their eligibility for continuing benefits. *Id.* 159, 186-89, 377, 398.

On May 9, 2005, as a part of the VCRC's periodic review of Disability Pension payment recipients, a Plan representative sent Denver a letter notifying her that she had to recertify her disability in order to continue receiving payments. *Id.* 030. In order to recertify, Denver had to return three forms to MetLife: an Authorization to Release Information, an Attending Physician's Statement of Functional Capacity, and an Employee Statement. *Id.* 033. Denver's Attending Physician's Statement, which was filled out by Dr. Robert Blackwood on June 7, 2005, states that Denver is able to sit for two hours, stand for one hour and walk for one hour, and that Denver is able to work a total of four to five hours per day. *Id.* Denver also disclosed in her Employee Statement that she was working part-time as a receptionist for Dr. Arsenio Ong. *Id.* 043. After receiving these documents, MetLife asked Dr. Blackwood to supply additional information regarding Denver's medical history, including progress notes, diagnostic testing results and referrals from June 1, 2004 through the present. *Id.* 057. In one of the progress notes

Dr. Blackwood provided, dated June 7, 2005, he concludes: "[i]t is doubtful that [Denver] will ever be able to return to full-time work of such a stressful nature [as her former job at Bell Atlantic]." *Id.* 068.

On August 4, 2005, a MetLife Nurse Consultant and a MetLife Physician Consultant reviewed Denver's file, including the additional medical and vocational information Dr. Blackwood submitted, and each concluded that Denver could perform sedentary work on a part-time basis. R. 011, 084. On August 16, 2005, MetLife's Psychiatric Consultant reviewed the same information and concluded that Denver's medical records did not support a finding that she had a psychiatric impairment. *Id.* Based on these determinations, a MetLife Case Management Specialist sent the VCRC a letter on August 17, 2005 explaining MetLife's conclusion that Denver no longer had a "total and permanent disability." *Id.* 083. Accordingly, on August 26, 2005, a Plan representative sent Denver a letter advising her that her Disability Pension would be discontinued. *Id.* 101-03.

On December 2, 2005, Denver sent the VCRC a letter appealing this denial. *Id.* 092. Denver emphasized that her medical issues had only worsened over the years and that: "I am still not able to work a job where I am required to be at work at all times or even at a specific time," and that "there are weeks at a time when I cannot work at all." *Id.* Denver included with her letter an office note from Dr. Blackwood dated September 20, 2005, an Attending Physician's Statement completed by her psychiatrist, Dr. Katherine Albach, an MRI (magnetic resonance imaging) and an MRA (magnetic resonance angiography) of her brain. *Id.* 018. Dr. Blackwood's office note confirms the assertion he made in his Attending Physician's Statement that Denver is able to work two to five hours a day at maximum capacity. *Id.* 093. Dr.

Blackwood remarks, however, that "many days, she is not able to work at all." *Id.* Dr. Blackwood's note also states that Denver suffers from "chronic anxiety and depression," and that she "should be considered functionally disabled." *Id.* His note concludes that Denver should "continue to be classified as disabled." *Id.* Dr. Albach's Attending Physician's Statement indicates that Denver has recurrent and severe "major depressive disorder" as well as a "panic disorder," and concludes that Denver has "moderate limitations" with respect to her psychological functions. R. 096.

On March 10, 2006, Denver's appeal file was sent to Dr. Rukhsana Sadiqali, Verizon's Medical Director, for review. *Id.* 109. Based upon Denver's medical and vocational records, Dr. Sadiqali found that that Denver's health problems did not preclude her from performing a sedentary job. *Id.* 019. Specifically, Dr. Sadiqali emphasized that Denver's medical conditions were being treated appropriately, that her aneurysm was being monitored, and that there was no indication surgery was being considered for her "brain abnormality." *Id.* Based upon the entire file, Dr. Sadiqali explained that it was "reasonable to conclude that Ms. Denver is able to perform a sedentary occupation and does not meet the criteria to receive her Disability Pension benefits." *Id.* 019. Accordingly, on April 24, 2006, Defendant VCRC denied Denver's appeal. *Id.* 001-05.

On April 10, 2009, Denver filed her Complaint, which she amended on December 1, 2009, alleging that Defendants "did not obtain adequate medical records necessary" for the review of her appeal, and that the denial of her Disability Pension was wrongful because it was based on "evidence selectively chosen, and in violation of the terms and conditions of the Plan." *See* 1st Am. Compl ¶ 27 (Paper No. 25).

5

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When both parties file motions for summary judgment, as here, the court applies the same

standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

ANALYSIS

I. **Denial of ERISA Benefits**

In reviewing a claim asserting a wrongful denial of benefits under the Employee Retirement Income Security Act, a court must engage in a two-part inquiry. First, a court must decide, as a matter of *de novo* contract interpretation, whether the ERISA plan at issue vested discretion in the plan administrator with respect to the contested benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Booth v. Wal-Mart Stores, Inc. Assocs. Health*

7

*& Welfare Plan,* 201 F.3d 335, 340-41 (4th Cir. 2000). Second, if the administrator's decision was discretionary, a court must determine whether the denial of benefits abused that discretion. *Johannssen v. Dist. No. 1 - Pac. Coast Dist.*, 292 F.3d 159, 168 (4th Cir. 2002); *Booth,* 201 F.3d at 341-42. In this case, the administrator had discretion and the undisputed facts show that it did not abuse that discretion.

### A. The Appropriate Standard of Review is Abuse of Discretion

The denial of benefits under an ERISA plan must "be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). In ERISA cases that involve a plan granting the administrator discretionary authority, "it is well-settled that courts review the denial of benefits under [the] policy for 'abuse of discretion.'" *Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long-Term Disability Plan,* 509 F.3d 644, 649 (4th Cir. 2007). The Bell Atlantic Pension Plan expressly grants discretion to its fiduciaries to determine whether a participant is eligible for benefits. R. 388. The Plan also states that upon appeal, the fiduciaries' decision is "final and binding upon all parties to the full extent permitted under applicable law." *Id.* Since the Plan confers discretionary authority over benefits determinations to the Plan's fiduciaries, the abuse of discretion standard applies.

Denver concedes in her Opposition brief that "[w]hen reviewing a fiduciary's denial of benefits claimed under an ERISA plan, if the plan vests its administrator or fiduciary with discretion to determine eligibility, a deferential standard is to be applied." Pl.'s Opp'n 1. Nonetheless, Denver argues that a modified standard of review is applicable because of

8

Verizon's conflict of interest as both Plan fiduciary and insurer. Pl.'s Summ. J. Mem. 5. As the Supreme Court clarified in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008), however, the presence of a plan administrator's conflict of interest does not alter the abuse-of-discretion standard of review. The Supreme Court recently affirmed this holding in *Conkright v. Frommert*, 130 S. Ct. 1640, 1647 (Apr. 21, 2010), where it held that a court must review an administrator's interpretation of a plan for abuse of discretion when the plan gave the administrator the authority to make eligibility determinations, even if she made a mistake in interpreting the plan. Correspondingly, the United States Court of Appeals for the Fourth Circuit holds, "courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by that administrator, even if the administrator operated under a conflict of interest." *Champion v. Black & Decker Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). Thus, Verizon's alleged conflict of interest does not affect this Court's deferential standard of review, though this Court may weigh a conflict of interest as "a factor when determining whether there is an abuse of discretion." *Glenn*, at 2348.

**B.      Defendants' Benefits Determination was Not an Abuse of Discretion**

Under the abuse of discretion standard, "the district court functions as a deferential reviewing court with respect to the ERISA fiduciary's decision." *Evans v. Eaton Corp.*, 514 F.3d 315, 321 (4th Cir. 2008). Thus, an administrator's "discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004) (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000). In assessing the reasonableness of a plan administrator's decision, courts should consider the language of the

plan, and whether the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). Substantial evidence is defined as "the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a reasoning mind would accept as sufficient to support a particular conclusion." *Donnell v. Metro. Life Ins. Co.*, 165 Fed. Appx. 288, 295 (4th Cir. 2006) (quotation omitted).

The Fourth Circuit has identified eight factors that bear on whether an abuse of discretion occurred:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43. In this case, the most relevant factors are the language of the plan, the adequacy of the materials considered and the degree to which they support the decision, whether the decision-making process was reasoned and principled, and the administrator's alleged conflict of interest. In applying these factors to Defendants' decision to stop continuing to pay Denver her Disability Pension, this Court may only consider the materials that were before the Plan fiduciaries at the time of the denial. *See, e.g., Donnell*, 165 Fed. Appx. at 294; *Bernstein*, 70 F.3d at 788-89. Thus, this Court must only review the adequacy of the administrative record, as that constitutes all the materials Defendants considered when making their decision.

1.   **Language of the Plan**

The Plan language supports Defendants' determination that Denver is not totally and permanently disabled because she is able to work part-time. Defendants' primary support for this conclusion is the Plan's definition that a person is disabled if she has a "medically determined condition of total and permanent disability." R. 377. Though Denver contends that this language is unclear, this Court is unable to conclude that Defendants abused their discretion in interpreting the term "total and permanent disability" to mean that a claimant is not disabled if she returns to work, even if only on a part-time basis.

In the first instance, this Court must consider the most reasonable interpretation of the plain language "total and permanent disability." An ERISA plan is interpreted "under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense." *Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995). Considering "total and permanent disability" in accordance with its literal and natural meaning, this Court concludes that the most reasonable interpretation of "total and permanent disability" is not that a claimant can work part-time, as Denver would suggest, but that a claimant cannot work at all. Thus, Defendants' contention that "total and permanent disability" means that a claimant is no longer able to work any job for any period of time is the most logical construction the plain language of the text. *See also Palm v. Wausau Benefits, Inc.*, 2007 U.S. Dist. LEXIS 21275, at *13-14 (D. Md. Mar. 26, 2007) (holding that a plan administrator did not abuse its discretion in determining that the plaintiff was no longer "totally disabled" based upon medical evaluations and a vocational analysis indicating that the plaintiff could perform a sedentary occupation on a part-time basis).

This interpretation of "total and permanent disability" is also bolstered by other language in the Plan explaining that a disabled employee who returns to work is no longer eligible for a Disability Pension. The Plan states:

> If the Disabled Employee recovers sufficiently to resume active service, the Disability Pension shall be discontinued and if the Employee reenters the service of a Participating Company at that time, the period of absence on Disability Pension shall be considered a leave of absence and not as a break in the continuity of the Employee's service.

R. 401. This provision explains that a claimant who returns to "active service" is no longer eligible to receive a Disability Pension. Furthermore, this language shows that a claimant is considered to have resumed working whether she returns to a "Participating Company," which is defined by the Plan as Bell Atlantic or any of its subsidiaries, or to any other employer. This interpretation of the Plan's language is consistent with decisions from other courts that have considered similar disability definitions, including the United States Court of Appeals for the Fourth Circuit. *See, e.g., Donnell v. Metro. Life Ins. Co.*, 165 F. App'x. 288, 293 (4th Cir. 2006) (holding that the phrase "any gainful work or service" encompasses "all work performed for income, without regard to whether it is performed full or part-time"); *Arnold v. Life Ins. Co. of N. Am.*, 650 F. Supp. 2d 500, 505 (W.D. Va. 2009) (holding that an employee is not disabled unless she is unable to perform "any occupation," whether full-time or part-time); *Brigham v. Sun Life of Can.*, 317 F.3d 72, 85-86 (1st Cir. 2003) (holding that the plan administrator did not act arbitrarily and capriciously in denying total disability benefits to a paraplegic with ongoing and significant muscle strain and pain, where the claimant could be retrained for part-time work in sedentary jobs); *Bond v. Cemer Corp.*, 309 F.3d 1064, 1067 (8th Cir. 2002) (holding that claimant's part-time work barred her from establishing that she could not continuously perform the substantial and material duties of "any occupation"); *Ladd v. ITT Corp.*, 148 F.3d 753, 754

(7th Cir. 1998) (holding that a worker is not disabled if capable of engaging in "substantial gainful activity" on a part-time basis); *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 185-86 (1st Cir. 1998) (holding that although a claimant's capacity "may have been limited to part-time work," this did not compel the conclusion that he was totally disabled where the plan defined that term as being when a claimant is "completely prevented from engaging in any occupation"). Accordingly, the language of the Plan supports Defendants' conclusion that Denver is not totally and permanently disabled because she is able to and has returned to work on a part-time basis.

Denver asserts that an "analysis of the short-term disability plan is inherently required for the Defendants to determine whether Plaintiff was qualified for benefits under the language of the [Bell Atlantic Pension Plan]." Pl.'s Opp'n 3. Thus, it appears that Denver believes the definition of "disability" under Bell Atlantic's short-term disability plan would expand the definition of "disability" under the Bell Atlantic Pension Plan. Denver's argument is drawn from a reference to "the short-term disability plan" made in the Bell Atlantic Pension Plan's definition of "disability":

> The words "Disability" or "Disabled" mean a medically determined condition of total and permanent disability which commences at a time when the participant is an Employee, **which entitles the participant to sickness disability benefits under the short-term disability plan maintained by the Participating Company**, and which continues to exist after the participant has received sickness disability benefits for the full period to which he is entitled under such short-term disability benefit plan.

R. 377 (emphasis added). Denver's argument seems to be that the term "total and permanent disability" does not have an independent meaning but instead must be read in conjunction with the short-term disability plan's definition of disability. Contrary to Denver's assertion, this reference does not indicate that the Bell Atlantic Pension Plan's definition of disability is the

13

same as the short-term disability plan's definition of disability, however that term is defined.³ Instead, the reference only demonstrates that an employee who qualifies as totally and permanently disabled under the Bell Atlantic Pension Plan would also qualify as disabled under the short-term disability plan. In other words, a participant who may be found to be "disabled" under the terms of the short-term disability plan due to a temporary health problem, such as an individual with a broken leg that will eventually heal, will not necessarily qualify as totally and permanently disabled under the terms of the Bell Atlantic Pension Plan. On the other hand, a participant who may qualify as totally and permanently disabled under the terms of the Bell Atlantic Pension Plan due to a life-altering event, such as an individual who becomes quadriplegic, will likely also qualify as disabled under the short-term disability plan. Since the definition of "disability" under Bell Atlantic's short-term disability plan does not expand or otherwise affect the definition of "disability" under the Bell Atlantic Pension Plan, Defendants did not abuse their discretion by not analyzing whether Denver qualified as disabled under the short-term disability plan before making their determination that she is no longer disabled under the terms of the Bell Atlantic Pension Plan.

2. **The adequacy of the materials considered and the degree to which they support the decision**

Defendants' denial of benefits is also supported by the materials Denver submitted. Dr. Blackwood's Physician's Statement explains that Denver is able to work four to five hours a day, and his September 20, 2005 office note confirms this conclusion. Though Dr. Blackwood's June 7, 2005 office note stating that "[i]t is doubtful that [Denver] will ever be able to return to full-time work of such a stressful nature" (R. 068) indicates that Denver is incapable of performing

---

³ Bell Atlantic's short-term disability plan is not a part of the Administrative Record.

her old job with Bell Atlantic, it does not contradict the Plan fiduciaries' conclusion that she is able to perform a less stressful job approximately twenty hours a week. Furthermore, Denver's Employee Statement acknowledges that at the time her benefits determination was made she was, in fact, working part-time as a receptionist. Thus, both Dr. Blackwood's and Denver's statements indicate that Denver is able to work, albeit on a part-time basis and with a flexible schedule.

While Dr. Blackwood concluded that Denver should be considered "functionally disabled," the discretion to interpret the plan and determine whether Denver is disabled under its terms lies with the Plan fiduciaries, not Dr. Blackwood. R. 388. Although Defendants cannot arbitrarily ignore Dr. Blackwood's determination that Denver is disabled, it reasonably may choose to value the opinions of its own medical consultants over Denver's treating physician. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003) (holding that ERISA does not require plan administrators to give special deference to treating physicians' opinions, although administrators may not arbitrarily refuse to credit them); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 126 (4th Cir. 1994). After considering Denver's file in its entirety, this Court finds that the evidence supports Defendants' discretionary decision that Denver is not disabled under the Plan.

3. **Whether the decisionmaking process was reasoned and principled**

The administrative record demonstrates that Defendants engaged in a reasoned and principled decisionmaking process. Denver's claim was reviewed by four different physicians, a claims manager and the VCRC at two separate stages, all of whom agreed that she was no longer disabled under the Plan's terms. R. 011-12. The notes from these reviews reflect a detailed

15

examination of all of Denver's submitted medical records and letters. *Id.* In addition, Defendants repeatedly invited Denver to supply any additional documentation or evidence in support of her claim. *Id.* at 009, 016, 057. Defendants' thorough investigation of Denver's claim and the multiple layers of review show Defendants followed a reasoned and principled decisionmaking process. *Cf. Stills v. GBMC Healthcare, Inc.,* 48 F. Supp. 2d 495, 498-99 (D. Md. 1999); *Robinson v. Phoenix Home Life Mut. Ins. Co.,* 7 F. Supp. 2d 623, 631-32 (D. Md. 1998).

Denver contends that the Plan fiduciaries did not perform a full and fair review of her claim because they did not consider an Attending Physician's Statement and letter written by one of Denver's physicians, Dr. Paul A. Valle, Jr. Denver contends that she submitted these materials prior to her final benefits determination and that they should have been included in the Administrative Record. Denver has not produced any evidence to support her claim that Defendants received but ignored these materials, however. On the contrary, Dr. Valle's notes indicate that his papers were not sent to the VCRC for review because Denver "never faxed the papers to me for the appeal as too depressed." Defs.' Opp'n Ex. B. Furthermore, Dr. Valle's conclusions are almost identical to Dr. Blackwood's. Most importantly, Dr. Valle writes that Denver is capable of working for twenty to twenty-eight hours per week, albeit in a stress-free environment, and that "[t]his [opportunity] is currently being provided where she works now at Dr. Arsenio Ong's office." Pl.'s Summ. J. Mem. Ex. O. Since Denver has not produced any evidence that Dr. Valle's materials were sent to the VCRC prior to its review of the Administrative Record, and since there is no indication these materials would have affected the

VCRC's final determination, Denver has produced no evidence to persuade this Court that Defendants' decisionmaking process was not reasoned and principled.

4. **Conflict of interest**

Defendants concede that a "theoretical" conflict of interest exists in this case. Summ. J. Mem. 15. Even if an actual conflict of interest existed in this case, however, the Supreme Court holds that the presence of a plan administrator's conflict of interest does not alter the abuse-of-discretion standard of review. *Frommert*, 130 S. Ct. at 1647 ("a systemic conflict of interest does not strip a plan administrator of deference"); *Glenn*, 128 S. Ct. at 2351 (a conflict of interest should not lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."). Instead, an administrator's conflict of interest is only "one factor among many" that a court must consider when determining the reasonableness of an administrator's decision. *Glenn*, 128 S. Ct. at 2351. The other *Booth* factors noted above suggest that Defendants' decision was "consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Smith*, 369 F.3d at 418 (quoting *Doe*, 3 F.3d at 87). Accordingly, this Court concludes that Defendants did not abuse their discretion in terminating Denver's Disability Pension. Therefore, Defendants are entitled to summary judgment.

II. **Denver's Motion for Leave to Supplement the Record and Defendants' Motion to Strike**

Denver requests that this Court grant her leave to supplement the record in this case and consider the Bell Atlantic Long-Term Disability Plan, which is separate from the Bell Atlantic Pension Plan, and which Denver contends was in effect when she was first found to be disabled in 1994. Notably, Denver does not make any reference to the Bell Atlantic Long-Term

17

Disability Plan in her Complaint. Instead, Denver claims in her Complaint that she was wrongfully denied benefits under the Bell Atlantic Pension Plan. *See* Am. Compl. ¶¶ 5, 11. Furthermore, Defendants have produced an uncontradicted affidavit by a Senior Staff Consultant in Verizon's legal department stating that in 1994 the Bell Atlantic Pension Plan was offered to salaried employees, such as Denver, whereas the Bell Atlantic Long-Term Disability Plan was offered to non-salaried employees. Defs.' Mot. to Strike, Ex. 1 ¶ 4. Indeed, the excerpt of the long-term disability plan that Denver provides refers to that plan as the "Bell Atlantic Long-Term Disability Plan (Non-Salaried Employees)." Pl.'s Mot. for Leave, Ex. B at 9. Thus, there is no evidence that Denver is eligible for benefits under this second plan.

Denver also asks this Court to review a letter written by Denver's current employer, Dr. Ong, which is not a part of the Administrative Record.[4] As this Court has explained, since the appropriate standard of review is abuse of discretion, this Court may only consider the materials that were before the Plan fiduciaries at the time they made the final benefits determination. *See, e.g., Donnell*, 165 Fed. Appx. at 294. Accordingly, since there is no evidence that Denver is eligible for benefits under the Bell Atlantic Long-Term Disability Plan, and since Dr. Ong's letter is not a part of the Administrative Record, Plaintiff's Motion to Supplement the Record is denied. As a result, Defendants' Motion to Strike Plaintiff's Supplemental Memoranda is moot.

---

[4] Denver contends that Dr. Ong's letter is helpful to her claim because it shows her work is "very part-time" and that she only works for Dr. Ong three days a month. Pl.'s Supp. 2 (Paper No. 46). Yet, Dr. Ong's letter does not indicate how often Denver works for him. It seems that Denver mistakenly interprets language in Dr. Ong's letter stating "My office is only open three days per *week*" (emphasis added) as evidence that Denver only works three days a *month*.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Paper No. 38) is GRANTED, Denver's Motion for Summary Judgment (Paper No. 36) is DENIED, Denver's Motion for Leave to File Supplemental Memoranda (Paper No. 53) is DENIED and Defendants' Motion to Strike Plaintiff's Supplemental Memoranda (Paper No. 52) is MOOT.

A separate Order follows.

Dated: August 3, 2010

/s/ _____
Richard D. Bennett
United States District Judge